# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

————————————

## No. ACM S32392

————————————

## UNITED STATES
*Appellee*

v.

## Yuriy L. GUSEV
Airman First Class (E-3), U.S. Air Force, *Appellant*

————————————

Appeal from the United States Air Force Trial Judiciary

Decided 21 August 2018

————————————

*Military Judge:* Joseph S. Imburgia (trial), Shelly W. Schools (*DuBay* hearing).

*Approved sentence:* Bad-conduct discharge, confinement for 295 days, reduction to E-1. Sentence adjudged 25 November 2015 by SpCM convened at Travis Air Force Base, California.

*For Appellant:* Major Allen S. Abrams, USAF; Major Ann W. Morgan, USAF; Major Lauren A. Shure, USAF.

*For Appellee:* Lieutenant Colonel Joseph J. Kubler, USAF; Major Collin F. Delaney, USAF; Major Tyler B. Musselman USAF; Gerald R. Bruce, Esquire; Mary Ellen Payne, Esquire.

Before MAYBERRY, MINK, and CARRILLO, *Appellate Military Judges*.

Judge CARRILLO delivered the opinion of the court, in which Chief Judge MAYBERRY and Judge MINK joined.

————————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 18.4.**

————————————

CARRILLO, Judge:

A special court-martial composed of a military judge sitting alone found Appellant guilty, consistent with his pleas, of one charge and five specifications of wrongful use of marijuana and opium, wrongful distribution of marijuana and opium, and introduction of opium onto a military installation, and one additional charge with two specifications of wrongful use of opium and introduction of opium onto a military installation, all in violation of Article 112a, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 912a. The military judge sentenced Appellant to a bad-conduct discharge, 11 months confinement, and reduction to E-1. The military judge awarded Appellant 89 days of pretrial confinement credit. The convening authority (CA) approved the bad-conduct discharge, 295 days of confinement, and reduction to E-1.

Appellant raised two assignments of error: (1) whether the conditions of his post-trial confinement violated Article 12, UCMJ, 10 U.S.C. § 812;, and (2) whether he is entitled to relief for unreasonable appellate delay pursuant to *United States v. Moreno*, 63 M.J. 129 (C.A.A.F. 2006). As a result of conflicting affidavits filed by the parties, we ordered a post-trial hearing in accordance with *United States v. DuBay*, 37 C.M.R. 411, 413 (C.M.A. 1967), and specified the additional issue of whether the actions of the Office of the Staff Judge Advocate amounted to misconduct for which Appellant is entitled to relief.

We find no error materially prejudicial to Appellant's substantial rights regarding the findings, but find unreasonable appellate delay for which we grant relief.

## I. BACKGROUND

### A. Pretrial Confinement

In 2015, Appellant was stationed at Travis Air Force Base (AFB), California. On 12 August 2015, the Air Force Office of Special Investigations interviewed Appellant for suspected drug use and distribution. Appellant's unit was unable to locate him on the evening of 13 August 2015. The following day, 14 August 2015, Appellant was restricted to base and required to comply with a call-in schedule. Also on that date, Appellant submitted to a urinalysis test (UA) pursuant to a search authorization. Appellant's sample tested positive for hydromorphone and morphine, which is consistent with opium use.

On his first day of restriction, Appellant missed several call-ins, and his unit searched, unsuccessfully, to find him. Appellant called in the next morning, 15 August 2015, and was then placed into pretrial confinement (PTC) at

the Solano County (California) Justice Center Detention Facility (JCDF)[1] where he was classified and confined in administrative separation.[2] Appellant was released from PTC on 21 August 2015, and was again restricted to base and given a call-in schedule.

On 10 September 2015, the Government preferred one charge with seven specifications against Appellant.[3]

On 22 October 2015, Appellant left base, bought opium outside the main gate, and drove back to the visitor center on base where he injected it into his arms. Security forces then apprehended Appellant and he was again ordered into PTC. Appellant was again confined at the JCDF. On 3 November 2015, the Government preferred an additional charge with two specifications against Appellant. From 22 October to 10 November 2015, Appellant was confined in administrative separation. Appellant was later reclassified and placed in general population on 10 November, where he stayed until commencement of his trial on 25 November 2015.

At trial, Appellant's defense counsel filed a motion for illegal pre-trial punishment credit for violation of Article 13, UCMJ, 10 U.S.C. § 813. At the hearing on the motion, a witness from the Solano County Sheriff's Department testified that Air Force inmates were to be kept separate from foreign nationals. The witness testified that the only way to accomplish this was to place military members "in solo admin sep housing."

The military judge found that during the first period of confinement (from 15–21 August 2015), when Appellant was in administrative separation, the Government did not violate Article 13, UCMJ. During that period, PTC served a legitimate objective because Appellant continued to commit misconduct that escalated in severity and defied his commander's attempts at less-restrictive measures. However, the military judge found administrative separation was tantamount to solitary confinement, and granted Appellant two-

---

[1] A memorandum of agreement (MOA) existed between the 60th Air Mobility Wing at Travis AFB and the Solano County Sheriff's Office, Fairfield, California, which allowed Travis AFB to utilize the JCDF for pretrial and post-trial confinement of military members when needed.

[2] Administrative separation is a classification status used by the Solano County Sheriff's Department where an individual is not placed with the general population. This allows the Department to comply with the MOA and avoid housing military members with foreign nationals who are not also members of the armed forces.

[3] On 16 October 2015, two specifications were withdrawn and dismissed with prejudice, and the original charge sheet was amended to include five specifications.

for-one credit, as well as seven additional days of credit.[4] The military judge awarded a total of 21 days pretrial confinement credit for that period of confinement.

For the second period of PTC, which commenced on 22 October 2015, Appellant was again placed in administrative separation, and later transferred to general population on 10 November 2015 where he remained until trial on 25 November 2015. The military judge awarded two-for-one credit for the entire period because while administrative separation was, again, for lawful confinement, it nonetheless amounted to solitary confinement; and when the Appellant was commingled with foreign nationals in general population, it violated Article 12, UCMJ. Thus, the military judge awarded 68 days of PTC credit for this entire 34-day period of confinement.

In total, the judge awarded 89 days of PTC credit.

**B. Post-trial Confinement.**

After trial, Appellant was again taken to the JCDF. From 25 November to 8 December 2015, he was in general population, and from 9–14 December 2015, he was in administrative separation (a total of 20 days). On 14 December 2015, Appellant was transferred to the Vandenberg AFB, California, confinement facility.

The staff judge advocate (SJA) signed the staff judge advocate's recommendation (SJAR) on 8 February 2016. One paragraph explained that Appellant had spent 41 days in PTC and that "[t]he military judge granted 7 days of [confinement] credit for the Government's noncompliance with PTC procedural requirements. The military judge also granted 2 for 1 credit for each day of confinement due to illegal PTC. . . . [T]herefore, the confinement sentence should be reduced by 89 days." The SJAR did not address post-trial confinement at the JCDF.

On 26 February 2016, Appellant submitted his clemency package, requesting three-for-one credit for the time he was held in general population (25 November to 8 December 2015), and four-for-one credit for the time he was held in administrative separation (9–14 December 2015). As justification, the area defense counsel (ADC) wrote that "[d]irectly after a ruling from the military judge holding illegal confinement conditions existed at [the JCDF],

---

[4] The military judge granted the additional credit after finding (1) Appellant had requested an attorney upon entering confinement, but was not given one until seven days later; (2) the Government failed to comply with Rule for Courts-Martial (R.C.M.) 305(h)(2)(A) and R.C.M. 305(i)(l); and (3) "one of the reasons [Appellant] was placed in pretrial confinement was for a mere matter of convenience so as not to waste other resources."

the Government promptly returned [Appellant] to these same illegal conditions," and "[w]hen confronted about their flagrant disregard for the court's ruling and clear violation of [Appellant's] rights, they responded by moving [Appellant] to even harsher conditions."

In the SJAR Addendum (Addendum) dated 3 March 2016, the acting SJA advised the CA of Appellant's clemency request for post-trial confinement credit. The Addendum recommended two-for-one confinement credit "for illegal post-trial confinement from 25 November 2015 to 14 December 2015."[5]

With regard to the adjudged confinement, the CA only approved "confinement for 295 days," which on its face corresponds to approving two-for-one credit for the 20 days of post-trial confinement at the JCDF. The CA's action also correctly stated Appellant would be "credited with 89 days for illegal pretrial confinement against the sentence to confinement."

## C. Post-trial communications.

On appeal, Appellant submitted an affidavit from his ADC, a captain, to explain "why a post-trial [Article] 39(a) hearing was not requested in [Appellant's case] after the defense learned that the government had continued to confine [Appellant] in confinement conditions which the [m]ilitary [j]udge deemed unlawful."[6] The affidavit was based upon a memorandum for record (MFR) the ADC had written close in time to the events.

In her affidavit, the ADC averred, *inter alia*, that during a break in Appellant's court-martial, she attempted to raise the conditions of the JCDF with the SJA, a colonel, based upon the judge's PTC ruling, but "[t]he SJA cut [her] off from further explaining [her] concerns" because he "couldn't have an opinion in the middle of trial."[7]

The ADC also asserted that two weeks after trial, Appellant contacted her and told her he was being held at the JCDF in general population. The ADC

---

[5] We find the SJAR and Addendum meet the minimum requirements under R.C.M. 1106(d)(4).

[6] The affidavit was submitted in response to the Government's assertion that Appellant should be denied relief because he did not exhaust all administrative remedies regarding post-trial confinement conditions.

[7] The ADC had also raised this issue in clemency, stating that, "[o]n the heels of the Court's [pretrial confinement] ruling, and prior to the announcement of sentence, Defense Counsel approached the [SJA], the security forces' [sic] escorts, and Travis Air Force Base confinement liaison, . . . and raised the concern that additional coordination would likely be required on behalf of the Government to avoid any further illegal confinement, in the event that [Appellant] received a sentence to confinement."

emailed and called the chief of military justice at Travis AFB, stating that Appellant "needs to be moved immediately to avoid further violation of his rights." She said she would wait to see if the Government could "resolve the confinement issue prior to going to the judge."

The ADC's affidavit also states:

> Several hours after speaking with the Chief of Justice, I received a phone call from the [SJA], who stated that if I was going to request a post-trial 39(a), then "would I be available to do another court-martial that same day for [Appellant]?" The SJA informed me that prior to trial their office received a urinalysis result of [Appellant], who had tested positive for heroin. He further stated that his office had discussed it thoroughly and decided rather than prefer an additional charge, they would proceed to the court-martial that was already scheduled. I was further informed that his office had decided to use the information from the urinalysis in rebuttal to [Appellant's] unsworn. I responded that this sounded like a discovery violation, as I had submitted a discovery request for all MRE 404 evidence and rebuttal evidence, and this was the very first time I was hearing any information about this evidence. The SJA stated that he and the commander were very happy with the sentence [Appellant] received at his court-martial, and they felt like the government had "already got their pound of flesh." He further stated that he really didn't want to go back to another court-martial, but if I was going to request a post-trial 39(a) for the continued illegal confinement by the government, he would have another charge preferred against [Appellant].
>
> Throughout the conversation, the SJA continued to turn back to the question of "if you request a 39(a) will you be prepared to go to trial that same day." I explained to the SJA that I couldn't answer that question at that time, as I don't know (1) if the judge would grant a 39(a), (2) what the judge's availability would be for a hearing and when it would be held, thus (3) it would be purely speculation if I had availability and would be prepared to go to anouther court-martial on the day of the potential post-trial 39(a). Before concluding the conversation, I said to the SJA (or words to the effect), "just so we're clear, Sir, you're indicating that if I request a post-trial 39(a) for the government's continued violation of [Appellant's] rights, you will make sure there's another court-martial. But, if I don't request the 39(a) there won't be another court-martial . . . this is to say, there will either be two hearings (a 39(a) and another court-

martial) or no further hearings." The SJA confirmed that this was what he was saying.

In response to the ADC's affidavit, appellate government counsel submitted a sworn affidavit from the SJA. In response to the ADC's statement about cutting her off during a break at trial, he stated:

> . . . This statement is inaccurate. [The ADC] approached me as I was walking in the hall after the court-martial and proceeded to lecture me about [the JCDF], and indicated that, "you need to do something about that jail…etc." I responded by saying that we were looking into the problem, that it would be solved, and that she should come to my office to discuss the issue. I did not think it would be professional to argue with an ADC in the hall in front [sic] other court-observers. More importantly, I wanted to make sure we had all the facts and could ascertain the truthfulness of the complaints alleged by her client. [The ADC] never made an appointment, nor came to my office to discuss this further.

> . . . [The ADC] appears to allege [I] threatened to take her client to court again if she did not waive her post-trial 39a [sic] hearing request. This is another mischaracterization of the facts. . . .

> Simultaneously to [the ADC's] request for a 39a [sic] session to address her post-trial concerns, we were contemplating disposition on a new charge of heroin usage. Knowing that [the ADC] wanted to schedule a 39a [sic] session with the judge, I had hoped to pin her down on a date for a new court-martial. . . .

> . . . Independent of this conversation, my office determined that the alleged "additional" heroin usage may have related to previous usages, and [Appellant's commander] was content that there was no need to prefer any additional charges.

After receiving the conflicting affidavits, this court specified the following issue for further fact-finding and briefing:

> DID THE ACTIONS OF THE SJA OR OTHER LEGAL OFFICE PERSONNEL AMOUNT TO PROSECUTORIAL MISCONDUCT, UNLAWFUL INFLUENCE, OR SOME OTHER FORM OF MISCONDUCT FOR WHICH APPELLANT IS ENTITLED RELIEF?

## II. DISCUSSION

Appellant acknowledges that he received additional confinement credit from the CA for his post-trial confinement served at JCDF, but on appeal asks for *additional* credit. The Government's Answer to Appellant's Assignment of Error asserts that Appellant should be denied relief because he did not exhaust all administrative remedies regarding his post-trial confinement conditions.

## A. Post-trial confinement.

### 1. Confinement with foreign nationals (25 November to 8 December 2015).

#### a. Law

We review de novo the question of whether an appellant's post-trial confinement violates Article 12, UCMJ. *United States v. McPherson*, 73 M.J. 393, 395 (C.A.A.F. 2014) (quoting *United States v. Wise*, 64 M.J. 468, 473 (C.A.A.F. 2007)). Article 12, UCMJ, states: "No member of the armed forces may be placed in confinement in immediate association with enemy prisoners or other foreign nationals not members of the armed forces." "Immediate association" has been interpreted to mean that military members can be confined in the same jail or brig as a foreign national, but military members must be segregated in different cells. *Wise*, 64 M.J. at , 477. Article 12, UCMJ, applies to military members confined in civilian state or federal facilities in the United States. *McPherson*, 73 M.J. at 394.

Typically, absent unusual or egregious circumstances, an appellant must exhaust administrative remedies before we will grant relief for a violation of Article 12, UCMJ. *McPherson,* 73 M.J. at 397; *see also United States v. Miller*, 46 M.J. 248, 250 (C.A.A.F. 1997). This requirement promotes "the 'resolution of grievances at the lowest possible level' with 'prompt amelioration' of the complaint while the prisoner suffers the condition," and assists in developing an adequate record to aid appellate review. *McPherson*, 73 M.J. at 397 (quoting *Wise*, 64 M.J. at 471); *see also United States v. White*, No. ACM 33583, 1999 CCA LEXIS 220, *3–4, (A.F. Ct. Crim. App. 23 Jul. 1999) (unpub. op.), *aff'd*, 54 M.J. 469 (C.A.A.F. 2001). To meet this requirement, an appellant must show that absent some unusual or egregious circumstance, he has exhausted the prisoner-grievance system in his confinement facility and petitioned for relief under Article 138, UCMJ, 10 U.S.C. § 938. *McPherson*, 73 M.J. at 397; *Wise*, 64 M.J. at 471 (quoting *White*, 54 M.J. at 472).

#### b. Facts

On 15 November 2017, a military judge conducted the *DuBay* hearing at Travis AFB. The hearing addressed the specified issue; the *DuBay* judge also

clarified facts on the original issue raised involving post-trial confinement conditions.

The *DuBay* judge issued the following relevant findings of fact regarding the agreement and policies in place for confining members at the JCDF:

> There is a Memorandum of Agreement (MOA) between the 60th Air Mobility Wing, Travis AFB, [California], and Solano County, [California], that allows military members from Travis AFB to serve their confinement time at the JCDF. The MOA states the County will determine inmate classification and custody grades, but Travis AFB Security Forces (SF) Staff can provide input on classification. It further states the County will house pretrial detainees and post-trial inmates separately, and will notify SF Staff is [sic] they are unable to do so. Finally, it states the County will not house inmates in immediate association with enemy prisoners of war or foreign nationals not members of the armed forces, and that SF Staff must be notified if the County is unable to meet this requirement.

> According to the SF Operating Instruction (OI), members sentenced to less than six months of confinement can be incarcerated at either the JCDF or at Vandenberg AFB, CA. Members sentenced to more than six months confinement are transferred to a Naval facility . . . . It takes approximately two to three weeks to outprocess a member from Travis AFB before they can be transferred to the Navy. During this outprocessing period, inmates are housed in the JCDF. All confinement decision[s] pertaining to members from Travis AFB are made by confinement personnel based on the OI.

Additionally, the *DuBay* hearing judge issued the following relevant findings of fact regarding JCDF and its confinement conditions:

> General population has three categories of custody: minimum security, medium security, and maximum security. . . . There is no way to separate foreign nationals from the general population. In fact, the JCDF does not track foreign nationals. . . . Inmates in general population are allowed to leave their cell for recreation and associate with other inmates. These inmates have access to programs and services.

> Administrative separation and administrative segregation are interchangeable terms at the JCDF. Administrative separation is the JCDF's highest security level and is the most restrictive housing. Inmates . . . are housed alone, have limited time out-

> side their cell, and remain isolated even when they leave their cell. Inmates can only communicate with each other through locked doors. . . . Administrative separation presents "difficult" living conditions. Inmates are placed in administrative separation for a variety of reasons, such as . . . inmates who need to be kept safe from other inmates . . . .
>
> . . . .
>
> . . . The only reason to leave a member in administrative separation is if the transporting agency requests it. Military members in custody usually remain in administrative separation, as this is the only way to ensure they are not in physical contact with foreign nationals. . . .

When Appellant returned to the JCDF on 25 November 2015, he was placed in general population. On 8 December 2015, when Appellant complained to his ADC that he was still in the JCDF and in general population, Appellant "was placed back into administrative separation." Appellant's transfer to Vandenberg AFB occurred on 14 December 2015, and he was later transferred to the Navy Brig in Charleston, South Carolina, on 3 February 2016.

We adopt the *DuBay* judge's findings of fact as our own as they are supported by the record and are not clearly erroneous. *See United States v. Leedy*, 65 M.J. 208, 213 (C.A.A.F. 2007).

### c. Analysis

Appellant's trial ended late on the night of 25 November 2015, and Appellant was then taken to the JCDF. From 25 November through 8 December 2015, Appellant was classified and housed in general population. This may have violated Article 12, UCMJ.

However, Appellant did not exhaust his administrative remedies prior to applying to this court. After discovering, post-trial, that Appellant was in general population, the ADC made a complaint "to the confinement facility," she "reached out to the legal office," and she later included the information in Appellant's clemency request. Appellant did not file a complaint under Article 138, UCMJ. We are not persuaded that Appellant exhausted all of his administrative remedies.

Even assuming *arguendo* that Appellant had exhausted all administrative remedies, we would not be inclined to grant further relief. The CA granted two-for-one credit for the days Appellant spent in general population. Providing two-for-one credit for a violation of Article 12, UCMJ, is a fair remedy. *See United States v. Gay,* 74 M.J. 736, 739 (A.F. Ct. Crim. App. 2015),

*aff'd*, 75 M.J. 264 (C.A.A.F. 2016) (affirming day for day credit when Appellant held in close proximity to foreign nationals).

Because Appellant did not exhaust administrative remedies, and he has already received adequate relief for the potential Article 12, UCMJ, violation, we find no further relief is warranted.

### 2. Administrative separation (9–14 December 2015).

#### a. Law

This court may employ its Article 66(c), UCMJ, authority to grant sentence relief even in the absence of cruel or unusual punishment in violation of the Eighth Amendment[8] and Article 55, UCMJ. *Gay*, 74 M.J. at 742. In reviewing our decision in *Gay* to use this authority, the Court of Appeals for the Armed Forces (CAAF) held that this court did not abuse its discretion in doing so, based on the facts of that case. *Gay,* 75 M.J. at 269. The CAAF held that our decision to grant sentence appropriateness relief in the case was based on a legal deficiency in the post-trial process and, thus, was clearly authorized by Article 66(c), UCMJ.

In *Gay*, the facts supporting legal deficiency in post-trial confinement conditions were:

> (1) there was no valid reason for placing Gay in solitary confinement; (2) avoiding additional Article 12 violations was not an acceptable reason to place him in solitary confinement; (3) the assertion that an Air Force official directed that Gay be placed in solitary was unrebutted; and, (4) Gay was easily transferred to a pod that did not house foreign nationals once his unit complained of his treatment.

*Gay,* 75 M.J. at 268–69 (citations omitted). Under those facts, the CAAF found sentence appropriateness relief was "clearly authorized under Article 66(c)." *Id.* at 269.

#### b. Facts

At trial, the military judge found pretrial confinement in administrative separation was tantamount to solitary confinement. Appellant does not assert that those same conditions post-trial amounted to cruel or unusual punishment in violation of the Eighth Amendment or Article 55, UCMJ, 10 U.S.C. § 855. After examining the record, we also find no such violation. Instead, citing this court's opinion in *Gay*, Appellant requests we exercise our

---

[8] U.S. CONST. amend. VIII.

authority under Article 66(c), UCMJ, 10 U.S.C. § 866(c), to provide some form of meaningful relief regarding his sentence. *Gay,* 74 M.J. at 742.

The facts in this case disclose that: (1) JCDF housed military inmates in administrative separation to keep them separate from foreign nationals; (2) there was no way to separate inmates from foreign nationals in general population so administrative separation was the only way the JCDF could ensure that military inmates were not housed with foreign nationals; (3) Appellant was confined in administrative separation from 9–14 December 2015 (six days); and (4) the CA granted two-for-one credit for each day Appellant was in administrative separation.

### c. Analysis

Appellant argues that the military judge found that Appellant's pre-trial time spent in administrative separation (equivalent to solitary confinement) "was subject to excessive conditions above what was necessary under the circumstances to serve any legitimate government objective." Relying on the military judge's ruling, Appellant further argues the conditions of post-trial confinement, with no restriction against punishment, require a different legal analysis.

Unlike the analysis for violations of Article 12, we have not held that an appellant must demonstrate that he has, absent unusual circumstances, previously exhausted administrative remedies prior to seeking judicial relief under Article 66(c), UCMJ. *United States v. Kyc*, No. ACM S32391, 2017 CCA LEXIS 376, *13–14 (A.F. Ct. Crim. App. 30 May 2017) (unpub. op.). We instead consider the entire record, including Appellant's failure to exhaust administrative remedies. *Id.* at *14.

Despite our significant discretion in reviewing the appropriateness of a sentence, this court may not engage in acts of clemency. *United States v. Nerad*, 69 M.J. 138, 145–47 (C.A.A.F. 2010). However, under our discretion for evaluating post-trial confinement conditions that do not rise to the level of a constitutional or statutory violation, we are charged with doing "justice." *Gay*, 74 MJ at 741 (quoting *United States v. Claxton*, 32 M.J. 159, 162 (C.M.A. 1991)). Unlike *Gay*, which fits easily within our broad charter to "do justice," this case does not. *Id.* The factors in *Gay* "evidence[d] a legal deficiency in the post-trial confinement conditions to which [Appellant] was subjected," *Gay*, 75 M.J. at 269. However, the CA in that case awarded one-for-one credit for the Article 12, UCMJ, violation, and no credit for when he was placed in solitary confinement to avoid the Article 12, UCMJ, violation. Appellant in this case has already received meaningful relief from the CA: two-for-one credit for the entire time he was in post-trial confinement at the JCDF. We therefore decline to exercise our discretionary sentence appropriateness authority to grant additional relief.

**B. Whether anyone in the office of the SJA engaged in prosecutorial misconduct, unlawful influence, or other misconduct.**

### 1. Prosecutorial misconduct.

#### *a. Law*

"On issues of prosecutorial misconduct, we review the military judge's findings of fact under the 'clearly-erroneous' standard. The questions whether the facts found by the military judge constitute prosecutorial misconduct and whether such misconduct was prejudicial error are questions of law that we review *de novo.*" *United States v. Argo*, 46 M.J. 454, 457 (C.A.A.F. 1997) (citations omitted).

"Prosecutorial misconduct is 'action or inaction by a prosecutor in violation of some legal norm or standard, *e.g.*, a constitutional provision, a statute, a Manual rule, or an applicable professional ethics canon.'" *United States v. Pabelona*, 76 M.J. 9, 11-12 (C.A.A.F. 2017) (quoting *United States v. Meek,* 44 M.J. 1, 5 (C.A.A.F. 1996)). It is described as "behavior by the prosecuting attorney that 'overstep[s] the bounds of that propriety and fairness which should characterize the conduct of such an officer in the prosecution of a criminal offense.'" *Pabelona*, 76 M.J. at 11–12, (alteration in original) (quoting *Berger v. United States*, 295 U.S. 78, 84 (1935)).

"The term 'prosecutor' . . . includes not only the trial counsel, but also the office of the SJA. Inclusion of the SJA within the definition of the term 'prosecutor' should not be construed to suggest that it reflects a general, disqualifying partiality by SJAs." Air Force Instruction (AFI) 51-110, *Professional Responsibility Program*, Standard 3-1.2, Discussion (5 Aug. 2014). The rules of professional responsibility recognize that the SJA is often "involved in [the] prosecution" of a case. AFI 51-110, *Air Force Rules of Professional Conduct (Rules)*, 5 August 2014, Rule 3.8, Discussion. For example, defense counsel may discuss pretrial case disposition with the SJA. AFI 51-110, Standard 4-6.1(b). In this case, the subject matter discussed between the SJA and the ADC related to a post-trial hearing; he was acting within the acceptable realm of an SJA as "prosecutor." Consequently, we examine the SJA's conduct in this case for prosecutorial misconduct.

AFI 51-110, Rules 8.4(c) and (d), provide in pertinent part, "professional misconduct [is] when a lawyer engage[s] in conduct involving dishonesty, fraud, deceit, or misrepresentation; [or] engage[s] in conduct that is prejudicial to the administration of justice." The rules "apply to all military and civilian lawyers in the Air Force Judge Advocate General's Corps." AFI 51-110, Rules 8.5(a).

A finding of prosecutorial misconduct does not automatically result in relief for an appellant. Instead, prosecutorial misconduct mandates relief only

when it actually "result[s] in prejudice." *Pabelona,* 79 M.J. at 12 (quoting *United States v. Fletcher*, 62 M.J. 175, 178 (C.A.A.F. 2005)). When assessing prejudice for prosecutorial misconduct, courts look to three factors: "(1) the severity of the misconduct, (2) the measures adopted to cure the misconduct, and (3) the weight of the evidence supporting the conviction." *Pabelona,* 79 M.J. at 12 (quoting *Fletcher*, 62 M.J. at 184). When considering prosecutorial misconduct as to sentencing, an appellate court utilizes the same three factors to determine whether the misconduct was "so damaging that [the court] cannot be confident that the appellant was sentenced on the basis of the evidence alone." *United States v. Halpin*, 71 M.J. 477, 480 (C.A.A.F. 2012) (internal quotation marks, alterations, and citations omitted).

### b. Facts

The *DuBay* judge's findings of fact revealed that when Appellant's trial ended the evening of 25 November 2015, the day before Thanksgiving, he was transported to the JCDF. The lead trial counsel "did not think about where [A]ppellant would be sent for his post-trial confinement." The assistant trial counsel was "not sure whether he knew on the day of trial or found out later that [A]ppellant was going back to the JCDF." The SJA did "not recall being told where [A]ppellant was going the night of his trial. He did not consider the possibility of [A]ppellant going back to the JCDF." As noted above, during a break in trial, Appellant's ADC approached the SJA to try and discuss post-trial confinement. The ADC then approached the noncommissioned officer in charge (NCOIC) of the Travis AFB confinement facility and told her that Appellant could not go back to the JCDF. The ADC asked the NCOIC to let her know if Appellant did not go to Vandenberg. While the NCOIC did not recall the discussion with the ADC, "[b]ecause [A]ppellant received more than six months confinement, she knew he would eventually be transferred to a Navy facility."

When the ADC departed the courtroom for the evening, she believed Appellant was going to Vandenberg. When Appellant called her on 8 December 2015, it was the first time she had heard Appellant was at the JCDF.

With regard to the 9 December 2015 conversation between the SJA and the ADC, the SJA did not take notes of the conversation. The *DuBay* judge concluded that the ADC did capture the contents of this conversation in a MFR the same day and "[t]herefore, [she] found it more accurately and thoroughly describe[d] what was said between the two." The ADC "believed [the SJA] was threatening her that if she raised the confinement issue in a post-trial hearing, [A]ppellant would have new charges preferred against him." The *DuBay* judge found "[t]his belief by [the ADC] was reasonable under the circumstances."

The ADC testified that after the phone call but before she spoke to her

client, she spoke to her leadership about whether the SJA committed an ethics violation and how she should proceed. The senior defense counsel (SDC) initially thought the ADC had misunderstood the SJA, so he spoke with the SJA himself. However, the SJA confirmed to the SDC that "if [the ADC] wanted to raise the issue of post-trial confinement before a military judge, she should be prepared to go to a court-martial for additional misconduct by [A]ppellant. [The SJA] also said [the ADC] should be zealous, but it came with a risk." There was no other testimony addressing her ethics inquiry.

The SJA testified at the *DuBay* hearing that when he asked if the ADC could go to trial on the same date as a hearing, his intent was to "pin down" her availability as the office had difficulties with the ADC in the past when scheduling the Article 32 and original trial. He elaborated, stating "my intent was if you've got other legal issues that need to be raised, let's finish all of those legal issues at once." Finally, the SJA testified that he was upset the ADC wanted to request an Article 39(a) hearing because he never believed Appellant's assertions about the conditions of his confinement. He believed the defense prevailed on the PTC motion "not because there was any illegal pretrial confinement going on, it was that [the Government] cannot prove that there wasn't any illegal pretrial confinement going on." He testified he "honestly didn't see that there was an issue there" about confinement.

The SJA testified to feeling "exuberant" and that it was "awesome" that the ADC was willing to go back to trial; but he also testified that "he did not want to go back to court if he did not have to" because "the whole reason the Government went forward with the SPCM was to get the case behind them." Accordingly, the *DuBay* judge found the SJA's testimony inconsistent.

At the time of the 9 December 2015 phone call, the SJA believed there was additional misconduct not covered by the special court-martial charges. It was only later, after the phone call, the SJA learned "that the UA result from 17 November 2015 might be evidence of opium use. . . . [and he] was later convinced they did not have sufficient evidence of heroin use."

Further testimony at the *DuBay* hearing, revealed "that the professional relationship between [the SJA] and [the ADC] soured after *United States v. Gibson*, which was litigated the week before [A]ppellant's trial." In *Gibson*, the ADC presented an innocent ingestion defense on a wrongful use of cocaine charge and garnered an acquittal. "In support of this defense, she called a civilian witness . . . who the Government believed was untruthful. [The SJA] felt strongly that the witness was lying and . . . [the ADC] suborned perjury." Testimony at the *DuBay* hearing indicated that the SJA "was very upset after the *Gibson* case."

There was significant evidence presented at the *DuBay* hearing explaining the professional relationship between the SJA and the ADC; however, the

*DuBay* hearing is devoid of timelines regarding this matter. In light of the fact that the *DuBay* testimony was almost two years after Appellant's trial, it is reasonable to attribute the evidence of the SJA and ADC's relationship to many facts outside the scope of the three-week period between the *Gibson* case and the 9 December 2015 phone call.

At some point after the 9 December 2015 phone call with the SJA and her conversations with her leadership, the ADC "talked to [Appellant] about the risks associated with raising the confinement issue in a post-trial hearing. Appellant decided not to risk another court-martial, and thus, did not request a post-trial Article 39(a) hearing." However, the ADC "would have preferred to request a post-trial Article 39(a) hearing with the military judge rather than rely on clemency because the [CA] was being advised by [the SJA]."

The ADC testified that in December 2015, she was aware of the requirement to exhaust administrative remedies regarding complaints about confinement in order to obtain appellate relief. However, based on her experience, it would have been unproductive to file a complaint with the JCDF because they were only doing what the Air Force directed. This is consistent with the JCDF classification sergeant's testimony. The Appellant did not pursue other administrative remedies.

### c. Analysis

There is no evidence of dishonesty, fraud, deceit, or misrepresentation on the part of the SJA, despite his inconsistent testimony at the *DuBay* hearing. The SJA was mistaken at the time of the phone call that he had evidence of a "new" charge of drug use. At the time he called the ADC, the SJA recalled thinking that the legal office was "still trying to decide what to do with the heroin charge."

However, we are not persuaded by the SJA's explanation that he wanted to resolve all "legal issues at once." A charge of heroin use is not generally characterized as a mere "legal issue" to be disposed of quickly. Preparing a case for prosecution, even for one charge, takes time and effort. Importantly, the SJA testified that the command was satisfied with the results of this trial. The SJA's explanation that they could "finish all of those legal issues at once" is, therefore, not convincing.

Furthermore, although the SJA "did not see an issue" regarding the conditions of Appellant's post-trial confinement, it was a potential issue. While the MOA allowed inmates to be housed at the JCDF pending transfer to a Naval facility, Appellant was housed in general population immediately after the trial (until the ADC notified the legal office). As stated above, this may have been in violation of Article 12, UCMJ. The trial ended at 2032 the night before Thanksgiving. No one apparently checked on the confinement condi-

tions or location of Appellant until well after the Thanksgiving holiday when he contacted his ADC.

Based on the record, we find it likely that the SJA's actions were driven by his misunderstanding of the evidence his office possessed, his belief that there was no illegal confinement conditions, and his predisposed opinion of the ADC based on the results of the *Gibson* case.

"In carrying out our professional responsibilities, we will treat all participants in the legal process, including counsel . . . in a civil, professional, and courteous manner, at all times and in all communications, whether oral or written." AFI 51-110, Attachment 3, *Air Force Standards for Civility in Professional Conduct.* In this case, not only was the SJA mistaken, it appears he allowed his emotions to interfere. The SJA's conduct on the phone with the ADC fell short of how we hope an SJA would interact with a junior officer and party to a court-martial. Before picking up the phone, he could have discussed with the trial team the "new" evidence, and determined if there was in fact evidence of an additional drug use and if so, if they thought they would be ready to go to trial almost immediately. Had he done so, he would have quickly realized his mistake. Alternatively, he could have told the ADC he would look into her client's confinement complaint.

Nonetheless, the SJA's conduct did not impact the post-trial proceeding. Appellant was moved out of general population and into administrative separation after he notified his ADC of the conditions of his confinement. The CA later awarded two-for-one credit for the entire time Appellant was housed at the JCDF post-trial. Although the SJA was mistaken about the evidence, we do not see that he engaged in dishonesty, fraud, deceit, or misrepresentation, or that his conduct was "prejudicial to the administration of justice." AFI 51-110, Rule 8(d). Therefore, we do not find prosecutorial misconduct.

Because we do not find the SJA's behavior rose to the level of prosecutorial misconduct, we will not analyze whether Appellant, himself, suffered prejudice to a substantial right.

### 2. Unlawful influence.

#### *a. Law*

Unlawful influence is prohibited under Article 37(a), UCMJ, 10 U.S.C. § 837(a) (2000), which states:

> No authority convening a general, special, or summary court-martial, nor any other commanding officer, may censure, reprimand, or admonish the court or any member, military judge, or counsel thereof, with respect to the findings or sentence adjudged by the court, or with respect to any other exercises of its or his functions in the conduct of the proceedings. No person

subject to this chapter may attempt to coerce or, by any unauthorized means, influence the action of a court-martial or any other military tribunal or any member thereof, in reaching the findings or sentence in any case, or the action of any convening, approving, or reviewing authority with respect to his judicial acts. . . .

The first sentence of Article 37(a) involves specifically unlawful *command* influence; the second sentence relates to unlawful influence. *United States v. Stombaugh,* 40 M.J. 208, 210-11 (C.M.A. 1994). Article 37 applies to the entire process of a court-martial, and a court-martial is not final until appellate review is concluded. Article 76, UCMJ, 10 U.S.C. § 876.

On issues of unlawful command influence, "the military judge's findings of fact are reviewed under a [clear error] standard, but the question of command influence flowing from those facts is a question of law that this Court reviews *de novo.*" *United States v. Wallace*, 39 M.J. 284, 286 (C.M.A. 1994) (citation omitted).

"Each of the unlawful-command-influence cases has involved some mantle of command authority in the alleged unlawful activity. The actors have been convening authorities, commanders, and staff judge advocates." *Stombaugh,* 40 M.J. at 211. SJAs "generally act[ ] with the mantle of command authority." *United States v. Kitts*, 23 M.J. 105, 108 (C.M.A. 1986) (citing *United States v. McClain*, 22 M.J. 124 (C.M.A. 1986)). Allegations of unlawful command influence are reviewed for both *actual* and the *appearance* of unlawful command influence. *United States v. Boyce*, 76 M.J. 242, 247 (C.A.A.F. 2017).

 "[I]n order for a claim of actual unlawful command influence to prevail, an accused must meet the burden of demonstrating: (a) facts, which if true, constitute unlawful command influence; (b) the court-martial proceedings were unfair to the accused … and (c) the unlawful command influence was the cause of that unfairness." *United States v. Boyce*, 76 M.J. 242, 247 (C.A.A.F. 2017) (quoting *United States v. Lewis*, 63 M.J. 405, 413 (C.A.A.F. 2006)). If an appellant raises some evidence of unlawful command influence, the burden shifts to the Government to rebut the allegation by showing "beyond a reasonable doubt that: (1) the predicate facts do not exist; (2) the facts do not constitute unlawful command influence; or (3) the unlawful command influence did not influence the findings or sentence." *United States v. Salyer*, 72 M.J. 415, 423 (C.A.A.F. 2013) (citing *United States v. Biagase,* 50 M.J. 143, 151 (C.A.A.F. 1999)).

Whether the conduct of the Government created an appearance of unlawful command influence is determined objectively. *Boyce,* 76 M.J. at 248 (citing *United States v. Stoneman*, 57 M.J. 35, 42 (C.A.A.F. 2002)). "Even if there was no actual unlawful command influence, there may be a question whether

the influence of command placed an intolerable strain on public perception of the military justice system." *Lewis*, 63 M.J. at 415 (internal citation and quotation omitted). The Government must prove beyond a reasonable doubt whether "an objective, disinterested observer, fully informed of all the facts and circumstances, would harbor a significant doubt about the fairness of the proceedings." *Boyce,* 76 M.J. at 249 (internal quotation marks and citations omitted).

While most claims under Article 37, UCMJ, allege that the unlawful influence was "committed by someone wearing the mantle of command, that is not a prerequisite to establishing a claim under Article 37." *United States v. Turner,* 75 M.J. 954, 962 (2016) (A.F. Ct. Crim. App. 2 Nov. 2016). In fact, "[i]t goes without saying that a violation of Article 37 does not automatically amount to unlawful command influence." *Stombaugh,* 40 M.J. at 211. Both unlawful command influence and unlawful influence are proscribed by Article 37, UCMJ, but the latter does not require the "mantle of command."

The test for unlawful influence is the same as the test for unlawful command influence, except that if an appellant meets his initial burden with respect to unlawful influence, the Government need only rebut the allegations by a preponderance of the evidence. *Stombaugh*, 40 M.J. at 213-14.

### b. Analysis

We look first at actual unlawful command influence and apply the three-part *Boyce* analysis. Appellant has failed to present some evidence that the facts constitute unlawful command influence. After talking to the SJA, the ADC believed the SJA threatened her that if she raised post-trial confinement in an Article 39(a) hearing, Appellant would have new charges brought against him. At the time, the SJA was under the mistaken belief that his office had evidence of uncharged drug use. His intent, stated at the *DuBay* hearing, was to prosecute the new charge on the same day as the Article 39(a) hearing because, in the past, his office had had a hard time coordinating court dates with the ADC because of her schedule. While it might have been misguided, there is nothing inherently wrong with the SJA's statement. At the time of the phone call, he believed he had uncharged evidence of Appellant using heroin. The SJA's conduct, if true, does not constitute unlawful command influence.

However, even if we were to conclude that Appellant has met the first prong of the three-part test, we find he has failed to meet the second prong. As stated previously, Appellant was not prejudiced by the SJA's conduct. In clemency, the CA granted two-for-one credit for Appellant's entire post-trial confinement at JCDF. This fact weighs heavily in our conclusion that the post-trial proceedings were not unfair to Appellant. Assuming *arguendo* an Article 39(a) hearing had been granted, it is only speculative what, if any, re-

lief Appellant would have received. Thus, we find the facts, if true, do not show Appellant was prejudiced post-trial. Therefore we do not find actual unlawful command influence.

Next, in assessing whether the actions of the SJA constituted apparent unlawful command influence, our conclusion that Appellant suffered no prejudice in post-trial processing leads us to find that a disinterested observer, fully informed of all the facts and circumstances, would not harbor a significant doubt about the fairness of the post-trial proceedings.

Finally, with regard to unlawful influence, Appellant failed to present "some evidence" that the post-trial proceedings were affected by unlawful influence. Moreover, even if he had met this threshold, we are convinced that the Government has proved beyond a reasonable doubt—much less by a preponderance of the evidence—that any alleged unlawful influence did not affect the post-trial proceedings. [9]

## III. DELAYED APPELLATE REVIEW

Finally, Appellant asserts he is entitled to meaningful sentence relief due to untimely appellate review and the resulting denial of due process. Appellant requests relief in the form of confinement credit. Although Appellant has not asserted a right to timely appellate review, his case was docketed with this court on 21 April 2016 and appellate review was not completed within 18 months.

We review de novo the issue of whether an appellant has been denied the due process right to a speedy post-trial review and appeal. *United States v. Moreno*, 63 M.J. 129, 142 (C.A.A.F. 2006). In *Moreno*, the CAAF established a presumption of unreasonable post-trial delay that requires a due process review when the Court of Criminal Appeals does not complete appellate review and issue a decision within 18 months of docketing. *Id.*

In conducting this review, we follow our superior court's guidance in using the four factors set forth in *Barker v. Wingo*, 407 U.S. 514, 530 (1972): "(1) the length of the delay; (2) the reasons for the delay; (3) the appellant's assertion of the right to timely review and appeal; and (4) prejudice." *Moreno*, 63 M.J. at 135. *Moreno* identified three types of prejudice arising from post-trial processing delay: (1) oppressive incarceration; (2) anxiety and concern; and (3) impairment of ability to present a defense at a rehearing. *Id.* at 138–39 (citations omitted).

---

[9] Furthermore, there is no evidence of conduct by any other member of the office of the SJA which amounts to unlawful influence or any other form of misconduct.

"We analyze each factor and make a determination as to whether that factor favors the Government or [Appellant]." *Id.* at 136. Then, we balance our analysis of the factors to determine whether a due process violation occurred. *Id. (*citing *Barker*, 407 U.S. at 533) ("Courts must still engage in a difficult and sensitive balancing process."). "No single factor is required for finding a due process violation and the absence of a given factor will not prevent such a finding." *Id.* Where an appellant has not shown prejudice from the delay, there is no due process violation unless the delay is so egregious as to "adversely affect the public's perception of the fairness and integrity of the military justice system." *United States v. Toohey*, 63 M.J. 353, 362 (C.A.A.F. 2006). We do not find a due process violation in Appellant's case.

Appellant's trial ended on 25 November 2015 and the CA took action on 3 March 2016. The case was docketed with this court on 21 April 2016, more than 27 months ago. The record of trial originally consisted of 196 pages of transcript, 9 prosecution exhibits, 10 defense exhibits, and 16 appellate exhibits. After receiving six enlargements of time, Appellant filed his assignment of error on 6 April 2017. On 5 May 2017, the Government filed their answer, and Appellant replied on 10 May 2017. As part of Appellant's reply to the Government's answer to his assignment of error, Appellant filed a motion to attach the ADC's affidavit. The Government reciprocated on 6 June 2017 with a motion to attach an affidavit by the SJA. This court granted both motions.

On 12 September 2017, we returned the record of trial to The Judge Advocate General for referral to an appropriate convening authority for the purpose of directing a *DuBay* hearing, and specified an issue. The hearing was held at Travis AFB on 15 November 2017, and the record of trial was returned to the court on 21 December 2017. On 19 January 2018, Appellant filed a supplemental brief, and the Government responded on 20 February 2018.

The existence of at least one presumptively-unreasonable delay triggers a full due process review under *Moreno*. However, because Appellant cannot demonstrate prejudice, we hold that there is no due process violation. Appellant completed his confinement on 5 May 2016, long before the first request by his appellate counsel for an enlargement of time; therefore, there is no oppressive incarceration. Further, Appellant did not provide evidence of particularized anxiety or concern. Lastly, Appellant was not hindered in his ability to present a defense at a rehearing. Therefore, Appellant was not prejudiced by the post-trial delay, and the remaining factors are not so egregious as to affect the public's perception of fairness and integrity in the military justice system. *See Toohey*, 63 M.J. at 363.

Nevertheless, recognizing our authority under Article 66(c), UCMJ, we have considered, even in the absence of a due process violation, whether relief for excessive post-trial delay is appropriate in this case. *See United States v. Tardif,* 57 M.J. 219, 221 (C.A.A.F. 2002). We believe relief is warranted due to the delay in the appellate review of this case. We therefore modify Appellant's sentence to a bad-conduct discharge, confinement for 295 days, and reduction to E-2.

## IV. CONCLUSION

The findings of guilt and the sentence, as modified, are correct in law and fact and no error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(c), UCMJ, 10 U.S.C. §§ 859(a), 866(c). Accordingly, the approved findings and sentence, as modified, are **AFFIRMED**.

FOR THE COURT

CAROL K. JOYCE
Clerk of the Court